IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

CAROLYN S. PROFFITT,                    )
                                        )
                Plaintiff,              )
                                        )
                                        )
v.                                      )        No. 2:06-CV-97
                                        )
                                        )
GROUP LONG TERM DISABILITY              )
PLAN FOR FAMILY PRACTICE                )
CENTER and HARTFORD LIFE                )
GROUP INSURANCE COMPANY,                )
                                        )
                Defendants.             )

## MEMORANDUM OPINION

This civil action is brought pursuant to the Employee Retirement Income

Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and is before the court for consideration

of the motion for judgment on the record filed by defendant Hartford Life Group Insurance

Company ("Hartford") [doc. 28] and the motion for judgment on the administrative record

filed by plaintiff Carolyn Proffitt ("Proffitt") [doc. 31].[1]

Hartford has asserted a counter-claim for the recoupment of the overpayment

of benefits based on Proffitt's retroactive award of social security disability benefits [doc.

36]. Proffitt has filed an answer to the counter-claim [doc. 37].

---

[1] Proffitt also raises a number of claims based on the denial of discovery. The issue of
discovery has already been addressed in a thorough and well reasoned opinion entered by the
magistrate judge on October 20, 2006, [doc. 22]. The court does not intend to revisit those claims
and issues herein.

# I.

## *Standard of Review*

Before addressing the standard of review in this case, the court needs to consider Proffitt's contention that Hartford may have relied on the wrong version of the Policy. Proffitt has filed as part of the record the 1997 version of the Policy, which she contends applies unless Hartford can show the terms of the Policy were changed, she was given notice of those changes, and she consented to those changes.

The 1997 Policy submitted by Proffitt and the group policy in the administrative record bear the No. SR 68081792. The following language appears on a "Group Long Term Disability Certificate" preceding the Policy booklet in effect at the time of Proffitt's loss:

> Continental Casualty Company
>
> Having issued Policy No. SR-68081792 . . .
>
> CERTIFIES that *You* are insured provided that *You* qualify under the ELIGIBILITY provision, become insured and remain insured in accordance with the terms of the policy. *Your* insurance is subject to all the definitions, limitations and conditions of the policy. It takes effect on the effective date stated in the EFFECTIVE DATE provision.
>
> This certificate describes *Your* eligibility for benefits and the terms and provisions of the policy. **It replaces and cancels any other certificate previously issued to *You* under the policy**.

A.R. 0037 [2] (emphasis added). The administrative record reflects that the 1997 Policy booklet had been superseded by the booklet Hartford relied on to evaluate Proffitt's loss. The record also indicates that identity of the correct Policy was confirmed by Hartford. In a letter to plaintiff's counsel from Cheryl Sauerhoff with Hartford, the following was stated:

> We have verified and obtained another copy of the policy, which is also contained in Ms. Proffitt's claim file. Enclosed is another copy of the policy that was in effect at the date of Ms. Proffitt's disability. This policy has been confirmed by The MGIS Companies (Medical Group Insurance Services, Inc.), who is the plan administrator for the Stedman policies. Further identification of this group is provided on the fax coversheet from Michelle Friedman, Product Manager/Stedman for MGIS. CNA Group Benefits was acquired by The Hartford effective January 1, 2004.

A.R. 0097.

As a member of the group Policy, Proffitt was subject to the revisions and changes made to the Policy. The language on the Policy certificate gave notice of the changes in the attached booklet and also that the booklet replaced and cancelled any previous certificate under the Policy.

In addition, Proffitt has not directed the court to any documentation in the record that gave her as an individual authority to approve changes to the group Policy. The Policy in effect at the date of Proffitt's loss states:

---

[2] A reference to "A.R." and a number or numbers is a reference to a page or pages of the administrative record.

> Coverage under the policy can be amended by mutual consent
> between the Participating Employer and *Us*.  No change in the
> policy is valid unless approved in writing by one of *Our* officers.
> No agent has the right to change the policy or to waive any of its provisions.

A.R. 0047.  Thus, the changes made to the Policy from the 1997 booklet could be and were made without the approval of Proffitt.  Proffitt's unsubstantiated arguments to the contrary do not invalidate the Policy in the administrative record.  Therefore, the court will look to the Policy in the record and determine what standard of review applies to Hartford's decision.

In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the United States Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id*. at 115.  If the plan herein grants the administrator or fiduciary the appropriate discretionary authority, this court must review the decision at issue under the "highly deferential arbitrary and capricious standard of review."  *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996).  This standard is the "least demanding form of judicial review of administrative action."  *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000).  The Sixth Circuit requires that a plan's grant of discretionary authority to the administrator must be "express."  *Perry v. Simplicity Eng'g*, 900 F.2d 963, 965 (6th Cir. 1990); *see also Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1373 (6th Cir. 1994) (requiring "a clear grant of discretion").

Decisions concerning eligibility for ERISA benefits are not arbitrary and

capricious if they are "rational in light of the plan's provisions." *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir.1988). "Before concluding that a decision was arbitrary and capricious, a court must be confident that the decisionmaker overlooked something important or seriously erred in appreciating the significance of evidence." *Marchetti v. Sun Life Assurance Co. of Can.*, 30 F.Supp.2d 1001, 1008 (M.D. Tenn. 1998) (citing *Wahlin v. Sears, Roebuck & Co.*, 78 F.3d 1232, 1235 (7th Cir. 1996)). "[W]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious." *Williams*, 227 F.3d at 712.

> Nevertheless, merely because our review must be deferential does not mean our review must also be inconsequential. While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions.

*Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005).

The subject plan contains an express grant of discretionary authority to the plan administrator. The Policy states, "When making a benefit determination under the Policy, *We* [CNA, now Hartford] have discretionary authority to determine *Your* eligibility for benefits and to interpret the terms and provisions of the Policy." A.R. 0037. This statement is a sufficient grant of discretionary authority. Therefore, the court will apply the arbitrary and capricious standard to Hartford's decision in this case.

Plaintiff also contends that Hartford is operating under a conflict of interest

because it operates as the plan administrator and funds the plan as well. Thus, Hartford both decides whether an employee is eligible to receive benefits and pays those benefits. "This dual function creates an apparent conflict of interest." *Glenn v. Metro. Life Ins. Co.*, 461 F.3d 660, 666 (6th Cir. 2006). The court agrees that Hartford is performing a dual function in this case and that there is a resulting inherent conflict of interest. However, the presence of a conflict of interest does not alter the standard of review. *Marchetti*, 30 F.Supp.2d at 1007. Rather, the administrator's conflict of interest is a factor considered by the court in its review of the administrative decision. *See id.*; *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 984 (6th Cir. 1991); *Best v. Nissan Motor Corp.*, 973 F.Supp. 770, 776 (M.D. Tenn. 1997). "In considering such a conflict, there must be significant evidence in the record that the insurer was motivated by self-interest, and the plaintiff bears the burden to show that a significant conflict was present." *Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 260 (6th Cir. 2006). The court will consider the inherent conflict of interest as a factor in determining whether Hartford's decision was arbitrary and capricious.

II.

The Policy defines "Disability" as follows:

> *Disability* or *Disabled* means that *You* satisfy the Occupation Qualifier or the Earnings Qualifier as defined below.
>
> Occupation Qualifier
> "*Disability*" means that during the *Elimination Period* and the following 24 months, *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:
>
> 1. continuously unable to perform the *Material and Substantial Duties* of *Your Regular Occupation*; and
> 2. not *Gainfully Employed*.
>
> After the *LTD Monthly Benefit* has been payable for 24 months, "*Disability*"means that, *Injury or Sickness* causes physical or mental impairment to such a degree of severity that *You* are:
>
> 1. continuously unable to perform the *Material and Substantial Duties* of any occupation for which *You* are or become qualified by education, training or experience; and
> 2. not *Gainfully Employed.*

A.R. 0040.

Proffitt worked as a registered nurse in a family practice clinic in Newport, Tennessee. Her last day of work was August 1, 2002, after which she applied for long term disability ("LTD") benefits based on her contention that she was totally disabled from lupus, fibromyalgia, fatigue, and anemia. Her claim was initially denied on February 17, 2003. Proffitt appealed the decision, but the denial was upheld by Hartford on May 5, 2003. A.R. 0054-55.

Hartford agreed to undertake a second appeal review based upon Proffitt's

submission of additional information. Hartford had all of Proffitt's medical records and additional information reviewed by a Dr. Brian Peck, a board certified rheumatologist, who concluded in a report dated January 10, 2005 that Proffitt could perform light duty work. A.R. 0517-22. Hartford issued another denial of Proffitt's claim for benefits on February 3, 2005. A.R. 0504-05. Proffitt then submitted the sworn statement of Dr. McConnell, her treating family physician and former supervisor at the clinic where she worked. Hartford submitted the statement to Dr. Peck who concluded that Proffitt's functionality was limited to sedentary rather than light work. A.R. 0492-495. Since her job as a nurse required light level work, Hartford approved Proffitt's claim for benefits in a letter dated February 25, 2005, for a period beginning October 31, 2002 through October 30, 2004. A.R. 0088-89. Thus, Proffitt received benefits for the 24 month "own occupation" period of the Policy.

Also in the February 25, 2005 correspondence, Hartford informed Proffitt that her claim for benefits under the "any occupation" provision of the policy was being submitted for review. A.R. 88-89. Proffitt's file was referred to Dara Bernard, a Rehabilitation Case Manager, to determine Proffitt's vocational capabilities. In a letter dated March 14, 2005, Bernard noted that the independent physician review by Dr. Peck of submitted information supported a functional ability to perform sedentary work. Based upon that functional assessment and Proffitt's vocational background, Bernard determined that Proffitt could perform gainful, alternate occupations that included but were not limited to telephonic nurse case manager, utilization review nurse, medical scheduler, and information desk clerk.

Therefore, Hartford terminated Proffitt's benefits as of October 30, 2004. A.R. 0085-86. On October 6, 2005, Proffitt submitted a written appeal of Hartford's denial of her claim for benefits under the "any occupation" provision. A.R. 0423.

The administrative record contains records submitted by Proffitt to Hartford for the physicians who treated her for her various conditions. It also contains the vocational assessment and social security decision Proffitt provided to Hartford.

<u>Examination Under Oath of Dr. David McConnell</u>

On November 4, 2004, Proffitt's counsel took the examination under oath of Proffitt's treating physician and former employer at the family clinic, Dr. McConnell. Proffitt's job responsibilities and physical demands of the work were discussed in detail. Also discussed was the diagnosis of systemic lupus erythematosus ("lupus" or "SLE"). Dr. McConnell opined that Proffitt had a positive antinuclear antibody test ("ANA"), which in his opinion cannot be caused by medication.[3] The discussion included a list of the signs and symptoms of lupus. The questioning also involved Proffitt's diagnosis of psoriatic arthritis and his observations concerning the objective manifestations of this condition in her while she was employed. Dr. McConnell talked about Proffitt having been diagnosed with fibromyalgia

---

[3] In the addendum record review of this statement performed by Dr. Peck, he disagreed with this position. A.R. 0493. Additionally, Dr. Peck found the diagnostic conclusions of Dr. McConnell improbable "since the coexistence of rheumatoid arthritis, SLE, and psoriatic arthritis in one patient is not only improbable, but impossible to diagnose, since many of the signs and symptoms may be indistinguishable. In addition, the laboratory abnormalities cited do not meet the diagnostic criteria. Regardless of technical accuracy, the patient's signs and symptoms are significant." A.R. 0495.

and that he agreed with that diagnosis. He also mentioned that she has been diagnosed with rheumatoid arthritis, which is a disease of "remissions and exacerbations." A.R. 0655.

Near the end of the questioning, Dr. McConnell was asked about whether Proffitt would be able to sit for long periods.

> Q.     Now doctor, with a job requiring someone to sit for long periods and use their hands and bend their neck, is this the type of job that you might preclude Ms. Proffitt from doing as well, and if so, why?
>
> A.     It's my professional opinion that she would not be able to do that job, because this would aggravate the inflammation that affects her joints of her hips, her knees, her neck, her shoulders, that that would be an aggravation to those.

A.R. 0667.

<u>Medical Records</u>

**Dr. McConnell**

The records for Dr. McConnell date from August 24, 2004, through November 28, 2005. They reflect multiple visits in which Proffitt sought treatment for a variety of medical problems, including inflammatory arthritis of the DIP joints of both hands; shoulder pain after a fall; osteoarthritis; depression; inflammatory joint disease; general malaise; and dizziness. A.R. 0263-0277, 0316.

**Dr. Kouser**

In a "to whom it may concern" letter dated January 21, 2004, Dr. Kouser, a rheumatologist who treated Proffitt, stated that Proffitt has a diagnosis of systemic lupus erythematosus, psoriatic arthritis/seronegative polyarthritis, fibromyalgia, depression and chronic renal insufficiency. For a disability determination, he would defer to Dr. McConnell. A.R. 0207.

Dr. Kouser saw Proffitt again January 26, 2004 with more or less the same symptoms that included weakness in arms and legs, shortness of breath, joint pain and "just a multitude of different symptoms." He ordered a follow up visit in 10 days. A.R. 0206.

Proffitt returned for a follow up on February 9, 2004, for the results of her blood work. All blood work was within normal limits, including the ANA which was negative. Dr. Kouser explained to Proffitt that it appeared that "overall the disease is in remission." He continued her on Plaquenil and methotrexate. A.R. 0205.

Proffitt next saw Dr. Kouser on April 19, 2004, at which time she had lost more weight and continued to have among other complaints generalized joint pain. Dr. Kouser continued to believe that Proffitt's lupus was in remission and he decided to gradually taper her off the methotrexate and continue with the Plaquenil in addition to Ultracet. At that time his biggest concern was Proffitt's weight loss. A.R. 0204.

Proffitt returned to see Dr. Kouser on May 19, 2004, at which time she continued to have the same symptoms, "which are primarily that of back pain, discomfort to lower extremities, weakness in lower legs and increasing sores to her mouth. She has also

noticed a rash to her lower legs." Dr. Kouser continued to believe the lupus was in remission as well as the seronegative polyarthritis/psoriatic arthritis. He continued to be concerned about her weight loss. He made no changes to her medications. A.R. 0203.

Dr. Kouser next saw Proffitt on August 20, 2004. He noted she had "gone downhill significantly since her last visit." He also noted that she stays tired and has generalized joint pain along with other symptoms. His examination showed negative fibromyalgia trigger point; good range of motion of C-spine in all planes; minimal tenderness to the lower lumbar spine; and the peripheral joint examination showed no synovitis. A. R. 0200. He stated that her symptoms were "very confusing" and that he was "not really sure if a rheumatological disease is [the] cause for her symptoms." A.R. 0201.

Proffitt returned to see Dr. Kouser on December 20, 2004, at which time she reported continuing to have a number of neurological symptoms including unsteady gait and headaches. She had gained some weight but continued to have generalized joint pain. Dr. Kouser referenced that he had provided Proffitt with a note stating that she is unable to participate in any gainful employment. A.R. 0199.

In a letter dated January 2, 2005, Dr. Kouser states that he has seen Proffitt since March 10, 2003, and that she has a history of lupus that is in remission. However, she has symptoms, "including joint pain, weakness, weight loss and unsteadiness of gait," that Dr. Kouser concluded made Proffitt unable to participate in gainful employment. A.R. 0198.

Dr. Kouser again saw Proffitt on May 20, 2005, at which time she continued to

12

have more or less the same symptoms. She reported fatigue, at times a loss of balance, and being tired with no energy. He continued her use of Plaquenil and referred her to a rheumatologist in Knoxville. A.R. 0197.

Proffitt returned to Dr. Kouser's clinic December 15, 2005. She reported that she continued to have the same symptoms, primarily that of weakness, generalized joint pain, and "just a multitude of different symptoms." He noted the number of medications that she continued to take. The examination showed "negative fibromyalgia trigger point with good range of motion of C-spine in all planes." There was "some tenderness noted to the lower lumbar spine." Peripheral joint examination showed no synovitis. Dr. Kouser made no changes to Proffitt's medication. A.R. 0196.

**Dr. Mahmood**

Dr. Mahmood saw Proffitt on October 3, 2005, A.R. 0164-167, and January 3, 2006, A.R. 0159-163.[4] Dr. Mahmood specializes in endocrinology and diabetes. He notes that Proffitt has inflammatory joint disease and is on Plaquenil. There is also reference to among other symptoms, tremors and frequent falling. Her ANA, DNA, and RF were negative. Her testosterone level was low, and she was treated with testosterone for several weeks.

---

[4] The notes are printed forms that are filled in and are extremely difficult to read.

<u>Vocational Assessment of Bart Brinkman</u>

Bart Brinkman performed a vocational evaluation of Proffitt on May 31, 2005, at the request of Proffitt's attorney. Proffitt reported her educational and vocational history as well as her medical history with the extensive list of her medications. Brinkman concluded that Proffitt had worked in jobs classified as medium to light according to the Dictionary of Occupational Titles. Proffitt reported that she performs some daily living activities on a limited basis with the assistance of her husband and family. She also reported that she has problems with concentration, memory loss, weakness, and balance. Brinkman also reviewed Proffitt's medical records including the examination under oath of Dr. McConnell. He concluded that the information provided by Proffitt was accurate but the medications could not be accurately confirmed from the records provided.

Brinkman noted that Proffitt "currently is restricted to a sedentary level of physical demand, at best [and has] a job loss access of 98.5 percent with her skills and qualifications." A.R. 0441. He also observed that Proffitt at that time had been out of the job market for three years, was taking a large number of medications, and was limited to lifting five pounds one-third of the day, and should not be placed in positions that could aggravate her inflammatory disease. A.R. 0441. Brinkman concluded:

> The issue of employment is related to factors of employability and factors of placeability. I am of the opinion that her employability factors, as outlined in this report, are major barriers to a favorable return to work outcome. The external placeability barriers including societal perception, employer bias, dependability on the job site, medication related issues for an

employer, potential safety issues for an employer, client's age and a limited ability to physically access a broader geographical area of employment without placing herself in a potential position of endangering her own safety do support my opinion that Mrs. Proffitt is 100 percent disabled from any occupation at this time.

A.R. 0441.

## Social Security Administration Decision

On June 28, 2005, an administrative law judge ("ALJ") entered a decision awarding Proffitt disability insurance benefits under the Social Security Administration ("SSA"). The decision references the following regarding the plaintiff's testimony at the hearing:

> The claimant testified that she experiences a lot of aching pain, joint pain, and fatigue. She also noted weakness on the left side, problems manipulating items with her fingers and hands, poor coordination, shakiness, and jitteriness. She stated she takes three different seizure medications for her shaking symptoms. The claimant further testified that she must avoid heavy lifting and prolonged sitting and standing, and noted difficulty crouching, bending, and squatting. In addition to seizure medication, the claimant stated she takes pain medications and muscle relaxants.

A.R. 0374. The ALJ considered Proffitt's testimony to be credible and considered her subjective allegations to be "highly credible." A.R. 0375.

Medical evidence at the hearing was provided by a Dr. Theron Blickenstaff, a board-certified internist. He reviewed the medical records and the testimony of Proffitt and testified that the record shows a positive ANA consistent with lupus and that the type of lupus

Proffitt has leaves her with good and bad days. Dr. Blickenstaff also stated that Proffitt's medications could be sedating, and he opined that she should avoid heights, moving machinery, and driving vehicles on the job. A.R. 0375.

The ALJ determined that the medical evidence established that Proffitt has fibromyalgia, systemic lupus erythematosus, psoriatic arthritis, chronic pain syndrome, hypothyroidism and chronic renal insufficiency. He concluded that Proffitt does not have the residual functional capacity for sedentary work and therefore is disabled as defined under the SSA.[5] A.R. 0375. The SSA decision was transmitted to Hartford by Proffitt's attorney on November 4, 2005, by fax and certified mail. A.R. 0351l.

<u>Reed Review Services</u>

Hartford engaged two physicians to conduct a review of plaintiff's medical records: Dr. Tanya Lumpkins (rheumatology) and Dr. Gary Nudell (internal medicine). Both of them issued reports dated February 15, 2006, in which they reference records they

---

[5] Sedentary work under the SSA is defined as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

reviewed.  The record summaries also include discussions with the providers they contacted.

On February 14, 2006, Dr. Lumpkins spoke by telephone with Dr. Kouser.  Dr. Kouser expressed concern that Proffitt appeared ill and was losing weight without a clear diagnosis.  Proffitt came to Dr. Kouser on March 10, 2003, with a previous history of lupus diagnosed by Dr. Capps in Knoxville.  The repeated blood work performed by Dr. Kouser was all negative and he was unable to support the diagnosis of lupus.  Concern about her joint pain led to a possible diagnosis of psoriatic arthritis, but Dr. Kouser recognized that the radiographic data in the medical record did not prove the diagnosis of psoriatic arthritis.  Dr. Kouser acknowledged the difficulty with supporting the claimant on total disability because of the absence of a clear diagnosis and objective evidence of impairment.

Dr. Lumpkins reached the following assessment:

The claimant has an inflammatory arthritis based on the elevation of inflammatory markers, the anemia not from GI loss, and the presence of synovitis documented on the physical examinations. The claimant does not have radiographic support for the severity of the arthritis[;] however[,] the disease activity would limit physical standing, walking, lifting and carrying.  The claimant would be physically capable based on the most recent progress note from the attending physician Dr. Kouser to be physically capable of sedentary work.

A.R. 0141-142.

Dr. Nudell spoke by telephone with Dr. McConnell.  At the time of the conversation, Dr. McConnell had not seen Proffitt in two months and felt that the majority of her care was now with Dr. Kouser.  Dr. McConnell was not willing to commit to any

17

discussion concerning the status of Proffitt's functional status, again deferring to Dr. Kouser. However, he did comment that Proffitt had experienced a significant weight loss and her overall weakness made it difficult for her to continue to work.

> Dr. Nudell stated as follows:
>
> My opinion from reviewing the records, and discussing the case with the A[ttending] P[hysician], is that there is no discernable diagnosis with this patient - she likely has fibromyalgia with a corresponding depression. I feel based on this diagnosis that this patient should be able to work in a sedentary position.
> . . .
> The difficulty with this case is the lack of objective data. There are descriptions from physicians that the patient has subjective symptoms, but none of the exams or lab data show any objective abnormalities. The only objective abnormality is the weight loss, and while the cause for this was not necessarily diagnosed, loss of weight in this case is not a factor that would lead to complete loss of functional ability. It appears from the records that this patient suffers from fibromyalgia rather than a connective tissue type disease. Fibromyalgia is difficult because there is typically a lack of objective findings. My opinion is that due to the lack of objective data, this patient should be able to function in a sedentary type job.

A.R. 0144.

The reviewing doctors conferred by phone and were in agreement "that the medical records failed to substantiate a diagnosis of sufficient severity to preclude the claimant from working in a sedentary capacity. The physical examinations and objective data in the medical record did not support the claimant's impairment completely from any occupation at a sedentary physical level." A.R. 0145.

Both reviewers were asked to consider additional medical records that consisted of progress notes from Dr. Kouser and records from Dr. Mubashir Mahmood, and they issued reports dated March 2, 2006. After considering the records, Dr. Lumpkins concluded, "The additional records from the endocrinologist and additional progress notes from Dr. Kouser fail to substantiate impairment to prevent the claimant from working at a sedentary capacity." A.R. 0134. Dr. Nudell concluded:

> I see no medical reason why this new information would change my previous review. The endocrinologist was treating the patient with hormonal therapy, presumptively to combat issues of fatigue. There was a subsequent increase in testosterone levels, and then an increase in renal function. Neither of these issues, however, have any bearing on her work status. Her rheumatologist states that she is stable from his standpoint, and the endocrinologist has marked on his exam that the patient's musculoskeletal exam was normal. It appears as though he adjusted her thyroid dose a small degree, but again this has no bearing on her work.
>
> My opinion has not changed based on review of these additional records.

A.R. 0135-136.

The reviewers discussed the additional medical records and concluded that "[t]he additional records from the endocrinologist and additional progress notes from Dr. Kouser fail to substantiate impairment to prevent the claimant from working at a sedentary capacity." A.R. 0136.

III.

*Analysis*

At issue in this case is whether Hartford's denial of LTD benefits to Proffitt under the "any occupation provision" of the Policy was arbitrary and capricious. For the reasons set forth below, the court finds that it was.

Plaintiff asked for a physical examination and contends that because Hartford did not secure a physical examination and relied on a records review, benefits should be awarded. The court does not agree that the failure to obtain an independent medical examination ("IME") alone warrants an award of benefits. However, a plan administrator's choice to employ a file review rather than a physical exam is a factor to consider in determining whether Hartford acted arbitrarily and capriciously in its review of Proffitt's claim. *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005). "[T]here is nothing inherently improper with relying on a file review, even one that disagrees with the conclusions of a treating physician." *Id.* at 297 n.6. However, "the failure to conduct a physical examination - especially where the right to do so is specifically reserved in the plan - may in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Id.* at 295. Additionally, when the review contains conclusions that involve "critical credibility determinations regarding a claimant's medical history and symptomology, reliance on such a review may be inadequate." *Id.* at 297 n.6.

The Policy provides the following regarding physical examinations:

> At *Our* expense, *We* have the right to have *You* examined as often as reasonably necessary while the claim continues. Failure to comply with this examination will suspend or terminate benefits, unless *We* agree *You* have a valid and acceptable reason for not complying.

A.R. 0046. Hartford's explanation for not having an IME performed was stated in its final denial letter dated March 6, 2006.

> We initially sought to have Ms. Proffitt examined by an independent internal medicine specialist in her area; however, the vendor Elite Physicians informed us their network has no qualified internal medicine specialist in Ms. Proffitt's area.

A.R. 0061. There is also an email that indicates that there was no board certified doctor in the Elite Physicians network within a 50-mile radius of Proffitt's location. A.R. 0360.

The court has great difficulty accepting Hartford's explanation and justification for not examining Proffitt in light of her request for an examination, the right reserved under the Policy to do so, and the circumstances of this case. The language in the policy makes it very clear that Hartford could have examined Proffitt multiple times at its request, "as often as reasonably necessary," and her failure to comply with any such request would have put her benefits in jeopardy. The court believes that had Hartford wanted Proffitt examined throughout the course of this claim, it would have had no difficulty in finding a physician to have done so. However, when the issue of an IME arose, according to Hartford no physician was available within 50 miles of Proffitt's home. With a limitation of that nature, claimants in rural areas could be regularly excluded from IMEs. Plan administrators could routinely

employ record reviews to the exclusion of an IME because IME physicians are "unavailable" in a claimant's area.

Proffitt does not live a great distance from Knoxville where there is not only a teaching hospital but a large medical community. While not unlimited, the medical resources in Knoxville are substantial and would no doubt provide a qualified physician to perform an IME on Proffitt. If absolutely necessary, Proffitt might even be willing to travel to Lexington, Kentucky or Nashville, Tennessee for an IME. The court finds that Hartford's failure to have Proffitt examined by an independent qualified physician a strong indication that it acted in an arbitrary and capricious fashion.

Proffitt also argues that Hartford acted arbitrarily and capriciously in that the reviewing physicians, Dr. Lumpkins and Dr. Nudell, were not provided the SSA decision, the examination under oath of Dr. McConnell, and the vocational assessment of Brinkman. This documentation was in the administrative record prior to these doctors submitting their record reviews on February 15, 2006 and March 2, 2006. There is no reference to these documents in the reviews by the doctors and no indication that they considered any of them. In light of the fact they these reviewers were considering issues related to "functionality" and "work capacity," the SSA decision and Brinkman vocational assessment would appear to be relevant parts of the record for their consideration.

In addition to the SSA decision apparently being excluded from the materials sent to Drs. Lumpkins and Nudell, there is no mention of it at all by Hartford in its review of

Proffitt's claim. While not binding, the SSA decision is not meaningless. *Calvert*, 409 F.3d at 294. Standing alone the SSA decision does not in and of itself warrant the conclusion that the denial of benefits was arbitrary and capricious. However, "[t]he SSA determination to award benefits to [Proffitt] is, instead, just one factor the Court should consider, in the context of the record as a whole, in determining whether [Hartford's] contrary decision was arbitrary and capricious." *Id.* at 295; *see also Glenn v. Metro. Life Ins. Co.*, 461 F.3d 660, 669 (6th Cir. 2006) ("That MetLife apparently failed to consider the Social Security Administration's finding of disability in reaching its own determination of disability does not render the decision arbitrary *per se*, but it is obviously a significant factor to be considered upon review.").

Nonetheless, in this case, though provided with the SSA decision, A.R. 0351, Hartford apparently did not provide it to the reviewing doctors and did not consider it in its overall review of Proffitt's claim. There is no reference to it at all in its analysis and ultimate denial of benefits. This fact weighs in favor of finding that the review was arbitrary and capricious.

The court has considered the entire record bearing in mind the standard of review. After weighing all of the factors discussed above, the court concludes that Hartford was arbitrary and capricious in its decision to deny LTD benefits to Proffitt. Nevertheless, as will be discussed below, it is only clear that Hartford was arbitrary and capricious in the manner of its denial of benefits, not that Proffitt is entitled to LTD benefits. The court will

therefore address the appropriate remedy to apply.

## IV.

### *Remedy*

"Once a court finds that an administrator has acted arbitrarily and capriciously in denying a claim for benefits, the court can either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits." *Cook v. Liberty Life Assurance Co. of Boston*, 320 F.3d 11, 24 (1st Cir. 2003). The Sixth Circuit recently held that remand to a plan administrator is appropriate "where the problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which he was clearly entitled." *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 622 (6th Cir. 2006) (internal quotation marks and citations omitted).

The court believes that it is not clear Proffitt is entitled to LTD benefits based on the "any occupation" provision on the policy. It is only clear that Hartford acted arbitrarily and capriciously in denying those benefits. Therefore, further fact finding is necessary for a complete review of Proffitt's claim, and that fact finding should be conducted by Hartford. *See Williams v. Int'l Paper Co.*, 227 F.3d 706, 715 (6th Cir. 2000) (recognizing remand is appropriate when factual determinations need to be made in order to determine whether claimant is entitled to benefits).

To that end, this claim will be remanded to Hartford for a full and fair review. Once remand is accomplished, there are several issues that Hartford needs to address. *First*, Hartford is to make every effort possible to obtain an appropriate and qualified physician to perform an IME of Proffitt. As discussed above, Hartford's reasons for not doing so as part of its review are not convincing. The court believes that the circumstances of this case call for an IME. *Second*, Dr. Lumpkins and Dr. Nudell are to be provided the SSA opinion, the EUO of Dr. McConnell, and the vocational assessment of Brinkman as well as the results of the IME once it is completed. In particular, the court wants these doctors to consider how Proffitt's multiple medications may affect her ability to perform sedentary work. *Third*, Hartford is to consider in its overall review of Proffitt's claim the SSA decision that awarded disability benefits to Proffitt.

In addition, the court acknowledges the supplemental brief [doc. 38] and attachments [docs. 39, 40] submitted by Proffitt and the response to these materials filed by Hartford [doc. 43]. However, these materials do not bear upon the issues that in the court's opinion call for remand at this time.

## V.

### *Counter-Claim for Social Security Benefits*

Proffitt was paid benefits under the Policy from October 2002 through October 2004. On June 28, 2005, the decision from the SSA found Proffitt disabled and entitled to

receive benefits in the amount of $1,126 per month. The Policy provides that "[a] claim for an overpayment can occur when *You* receive payment from a Deductible Source of Income." A.R. 0047. Deductible sources of income under the Policy include: "Disability benefits paid, payable, or for which there is a right under, The Social Security Act, including any amounts for which *Your* dependents may qualify because of *Your Disability*." A.R. 0041. Hartford asserts that it has overpaid benefits to Proffitt in the amount of approximately $23,646. Proffitt states in her answer that "Defendant Hartford has not specified an identifiable fund of monies for recoupment and thus this claim may be a suit at law and not at equity. Thus, an Erisa Counter-Claim may be inappropriate" [doc. 37].

Hartford relies on *Gilcrest v. Unum Life Ins. Co. of Am.,* No. 05-CV-923, 2006 WL 2251820 (S.D. Ohio Aug. 4, 2006) as authority for maintaining its counter-claim. In *Gilcrest,* the long-term disability plan Unum had issued and under which Gilcrest received benefits called for the amount of any SSA award to be subtracted from the benefits paid. Unum failed to subtract the amount of the SSA payments and Gilcrest did not pay back the amount. When Gilcrest sued for among other things reinstatement of his long-term disability benefits, Unum asserted counterclaims for breach of contract and unjust enrichment. Gilcrest argued that because the amount at issue was not contained within an identifiable fund, Unum was seeking legal not equitable relief. The district court held that the relief Unum sought was equitable and "a particular share of a specifically identified fund; namely, the amount it overpaid Gilcrest by not subtracting his Social Security award." *Id.* at *3 (internal quotation

marks omitted).  The court therefore granted Unum's motion for summary judgment on its claims.  *See also Dillard's Inc. v. Liberty Life Assurance Co. of Boston*, 456 F.3d 894 (8th Cir. 2006) (circuit court affirmed award to insurance company for reimbursement of overpayments made to employee beneficiary who received SSA benefits); *Disability Reinsurance Mgmt. Servs., Inc. v. DeBoer*, No. 2:06-CV-21, 2006 WL 2850120 (E.D.Tenn. Sept. 29, 2006) (court granted reimbursement for overpayments of disability benefits to claimant who received SSA benefits).

This case requires the same result. The relief Hartford seeks is equitable in nature and permissible under ERISA.   The Policy calls for the deduction of SSA benefits from the monthly benefits received; thus, Hartford seeks a specifically identifiable fund, the overpayments from the SSA benefits paid to Proffitt.  Therefore, Hartford is entitled to recoup the overpayments, and a judgment will be entered in Hartford's favor.

Additionally, for the reasons stated herein, Proffitt's claim will be remanded to Hartford.  The court will retain jurisdiction, and the case will be stayed pending Hartford's review and ultimate decision.  *See Bowers v. Sheet Metal Workers' Nat'l Pension Funds*, 365 F.3d 535 (6th Cir. 2004).   An order consistent with this opinion will be entered.


ENTER:


_____s/ Leon Jordan_____
United States District Judge